DIANE P. WOOD, Circuit Judge.
 

 The net of potential liability under the Comprehensive Environmental Response, Compensation and Liability Act, better known as CERCLA, 42 U.S.C. §§ 9601
 
 et seq.,
 
 is wide indeed, reflecting the need both to clean up the nation’s toxic waste sites and the practical imperative to find the necessary money for the job. The cleanup will be less likely to occur if potentially responsible parties do not come forward, yet the often astronomical sums needed to restore these sites can deter prompt remedial action. CERC-LA protects parties who settle claims with the government from liability for contribution in suits relating to “matters addressed” in administratively or judicially settled consent decrees. See § 113(f)(2), 42 U.S.C. § 9613(f)(2). In this interlocutory appeal, certified pursuant to 28 U.S.C. § 1292(b), we have been asked to decide several questions relating to the breadth of one of those settlements. The central issue is whether a 1982 consent decree approved in
 
 United States v. Seymour Recycling Corp.,
 
 554 F.Supp. 1334 (S.D.Ind.1982), to which Cummins Engine Co. and its fellow appellants were parties (to which we refer as the “Cummins group”), stands in the way of the efforts of Rumpke of Indiana, Inc. (“Rumpke”), either to recover its costs of cleaning up a site arguably not covered by the
 
 Seymour
 
 decree under § 107(a) of the Act, 42 U.S.C. § 9607(a), or to obtain contribution from the Cummins group under § 113(f)(1) of the Act, 42 U.S.C. § 9613(f)(1). We agree with the district court that the
 
 Seymour
 
 decree did not encompass the matters Rumpke is now raising and we accordingly affirm its order.
 

 I
 

 The background facts are relatively straightforward. In 1984, Rumpke bought a 273-acre dump known as the Uniontown Landfill from George and Ethel Darlage. At that time, the Darlages informed Rumpke that the landfill had never accepted hazardous waste. For reasons undisclosed on this record, Rumpke did not conduct its own inspection of the land for environmental hazards prior to the sale. In light of where we are today, it is easy to predict what happened next. In 1990, to its professed surprise, Rumpke discovered that the Darlages’ beliefs about the landfill had been quite wrong. In fact, a cocktail of hazardous wastes had been deposited at Uniontown for many years, and volatile organic compounds (VOCs) were migrating to surrounding areas. Looking into the matter, Rumpke determined that much of this material had come from the Seymour Recycling Corporation, which was located about ten miles away in Seymour, Indiana. For many years, Seymour had distilled for reuse acetones, aleo-
 
 *-347
 
 hols, paint thinners, chlorinated solvents, and freon materials, all of which had been discarded by various manufacturers. The distilling process yielded both reusable solvents and a toxic sludge. Seymour disposed of the sludge by shoveling it into 55-gallon drums, or on other occasions, incinerating it and storing the resulting ash in similar drums. Rumpke believed that some of those 55-gallon drums made their way to the Union-town landfill. Because Seymour Recycling was by this time out of the picture, Rumpke brought this action against the manufacturers that used to send materials to Seymour Recycling for processing.
 

 Rumpke’s lawsuit opened a Pandora’s Box of its own. Whatever one might say about the Uniontown site, it had become clear in the 1980’s that the Seymour site was an environmental disaster area. Seymour Recycling had left some 60,000 drums and 98 bulk storage tanks, in various stages of decay, strewn about the site. By 1980, the drums and tanks were leaking, exploding, and sending clouds of toxic chemicals into the air over nearby residential areas. The United States responded with a complaint in May 1980, alleging violations of section 7003 of the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6973, and section 311 of the Clean Water Act, 33 U.S.C. § 1321. In 1982, the United States filed an amended complaint adding allegations under CERC-LA, §§ 106 and 107, 42 U.S.C. §§ 9606 and 9607, which had been enacted in the meantime. The amended complaint added 24 new defendants who allegedly had transported hazardous wastes to the Seymour site for handling, storage, disposal, or treatment. At the same time, the State of Indiana and the County of Jackson moved to intervene in the action.
 

 The amended complaint was accompanied by a proposed consent decree that was filed with the court, as required by § 122(d), 42 U.S.C. § 9622(d), which the court accepted in due course. See
 
 Seymour Recycling,
 
 554 F.Supp. 1334, supra. The decree resolved all obligations and responsibilities of the settling companies with respect to “the Seymour site.” The companies paid agreed amounts into the Seymour Site Trust Fund, which was then available to trustees to perform the work described in an exhibit to the decree. It provided for penalties in the event the work was not performed satisfactorily; it gave the United States and the State the right to access and inspect the site at all times until the work was completed; and it contained various administrative provisions. The decree also promised, in section XII, that the United States, the State, and the local governments would not bring any more civil actions against the settling companies:
 

 ... arising out of or related to the storage, treatment, handling, disposal, transportation or presence or actual or threatened release or discharge of any materials at, to, from or near the Seymour site, including any action with respect to surface cleanup and soil or groundwater cleanup at the Seymour site.
 

 Our case arises because the defendants Rumpke wants to pursue — Cummins, Ford Motor Company, International Business Machines Corp., General Motors Corp., and Essex Group, Inc. — were among the
 
 Seymour
 
 settling parties.
 

 II
 

 After Rumpke filed its action with respect to the contaminated Uniontown site, the Cummins group moved for summary judgment against Rumpke’s claims. They argued that Rumpke’s suit was blocked by the language just quoted from the 1982
 
 Seymour
 
 consent decree, by virtue of CERCLA § 113(f)(2), which reads as follows:
 

 A person who has resolved its liability to the United States or a State in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed in the settlement. Such settlement does not discharge any of the other potentially liable persons unless its terms so provide, but it reduces the potential liability of the others by the amount of the settlement.
 

 The Cummins group reasoned that (1) the Rumpke suit presented “claims for contribution,” and (2) the claims were “matters addressed in the settlement” by virtue of section XII of the decree. Specifically,. with appropriate ellipses, they argued that section
 
 *-346
 
 XII covered actions “arising out of ... the ... transportation ... of any materials ... from ... the Seymour site.” Rumpke’s claim against them alleged that materials from the named manufacturers had been transported from the Seymour site to the Uniontown site; thus, they asserted, it fell squarely within the language of section XII and the claim was barred by § 113(f)(2).
 
 Q.E.D.
 

 In the order on interlocutory appeal, the .district court did not dwell on the question whether the Rumpke suit presented claims for contribution, evidently for two reasons. First, it noted that Rumpke’s suit was in part based on § 107(a) of the Act, which provides for private cost recovery, rather than contribution. It acknowledged that
 
 Akzo Coatings, Inc. v. Aigner Corp.,
 
 30 F.3d 761 (7th Cir. 1994), held that claims by one potentially responsible party (PRP) (here, Rumpke as present landowner) against another (here, the Cummins group) must normally be brought as contribution claims under § 113(f)(1), but it noted that
 
 Akzo
 
 also recognized an exception to that rule. Under the exception, a landowner may bring a § 107 action to recover for its direct injuries “if the party seeking relief is itself not responsible for having caused any of the hazardous materials to be spilled onto the property.”
 
 Rumpke of Indiana, Inc. v. Cummins Engine Company, Inc.,
 
 No. IP 94-1636-C at 1 (S.D.Ind. May 23, 1995). The court found that it was factually uncertain whether Rumpke was entitled to invoke the
 
 Akzo
 
 exception, and it accordingly denied summary judgment for the Cummins group on that point. Second, the court knew that Rumpke’s complaint also asserted, in Count II, an express claim for contribution under § 113(f)(1). Thus, recognizing that the case at least for Count II raised a contribution claim, the court’s order proceeded immediately to the question whether the
 
 Seymour
 
 settlement resolved all potential liability of the Cummins group with respect to the Un-iontown site.
 

 Construing the language of the
 
 Seymour
 
 decree as a whole, the court found that it dealt only with the Seymour site. It noted that nothing else in the decree, apart from the excerpt from section XII quoted above, contained even a hint of an attempt to resolve future disputes caused by the trucking of waste from Seymour to other locations. CERCLA and the Superfund Amendments and Reauthorization Act of 1986 (SARA) (which added § 113 to CERCLA), anticipate site-specific remedial activity, which led the district court to conclude that “the settlement authority of the United States is limited to the individual facility.”
 
 Rumpke,
 
 No. IP 94-1636-C at 6 (S.D.Ind. May 23, 1995). Finally, the court concluded that the word “transportation” in section XII, on which the Cummins group relied so heavily, could be interpreted reasonably to mean either leaching from the Seyxhour site or any other transportation to contiguous sites. It accordingly granted Rumpke’s cross-motion for summary judgment on the issue of the applicability of the 1982 consent decree to the problems at Uniontown. About two months after it denied reconsideration of that order, the court certified it for interlocutory appeal to this court under 28 U.S.C. § 1292(b).
 

 In a supplemental order written in response to this court’s order requiring the parties specifically to identify the questions to be certified and why they met the criteria of § 1292(b), the district court described the primary controlling question of law as follows: “whether Rumpke’s action against Settlers is barred pursuant to the earlier consent decree with the United States.” Encompassed within that question were several others: (1) whether, the pertinent environmental statutes limit the settlement authority of the United States to individual facilities; (2) whether a settlement dealing with one facility (here, Seymour) may bar liability for waste disposed by or through that facility to another one (here, Union-town); and (3) whether the consent decree itself is ambiguous, thus making a ruling on its effect
 
 as a matter of law
 
 inappropriate. The district court recognized that if it had erred on the effect of the 1982
 
 Seymour
 
 decree, the litigation would be terminated for the Cummins group. With the benefit of this explanation, this court granted § 1292(b) certification for the appeal.
 

 
 *-345
 
 III
 

 Before turning to the specific questions posed by the district court, we consider briefly the scope of our review in this kind of interlocutory appeal. The Supreme Court recently had occasion to consider the scope of § 1292(b) review in
 
 Yamaha Motor Corp., U.S.A. v. Calhoun,
 
 — U.S.—, 116 S.Ct. 619, 133 L.Ed.2d 578 (1996). The Court there decided that, in keeping with the language of the statute, “appellate jurisdiction applies to the order certified to the court of appeals, and is not tied to the particular question formulated by the district court.”
 
 Id.
 
 at 623 (emphasis in original). We may therefore address any issue fairly included within the certified order granting partial summary judgment to Rumpke and denying the Cummins group’s motion, because it is the order that is before us on appeal, rather than the questions themselves.
 

 The central question that concerned the district court was whether the 1982 settlement protects the Cummins defendants from this suit, as a result of the protection afforded by § 113(f)(2). As we noted above, § 113(f)(2) is triggered when several circumstances are present: (1) a person, must have resolved liability either to the United States or a State in an administrative or judicially approved settlement, (2) it must be facing “claims for contribution” in the present suit, and (3) those claims must encompass “matters addressed in the settlement.” In our view, however, before addressing the specifics of § 113(f)(2), we must decide how Rump-ke’s § 107(a) theory affects the case.
 

 A
 
 Claims for Direct Cost Recovery and Contribution
 

 Rumpke’s suit against the Cummins group was based on both the cost recovery theory of § 107(a) and the contribution theory of § 113(f)(1). The district court, as noted above, did not find it necessary to decide definitively whether the § 107(a) theory was sustainable, because it believed that issues of fact needed to be resolved regarding the question whether Rumpke was the kind of innocent landowner entitled to bring a § 107(a) cost recovery action under our
 
 Akzo
 
 opinion. It did not discuss the differences between § 113(f)(1) and § 107(a) in the order we are reviewing. We believe, nonetheless, that we should reach the question whether this suit may proceed under § 107(a), or under § 113(f)(1), or both. If § 107(a) is unavailable as a matter of law to Rumpke, we have only the § 113(f)(1) arguments to consider, which in turn requires us to interpret the
 
 Seymour
 
 consent decree. On the other hand, if Rumpke is entitled to proceed under § 107(a), the contribution bar of § 113(f)(2) may not apply at all; if it does not, then the dispute about the scope of the
 
 Seymour
 
 decree might be beside the point. Either way, it appears to us that the proper basis for Rumpke’s action is a question fairly comprehended within the order under review.
 

 1.
 
 Rumpke’s § 107(a) claim.
 
 Rumpke pointed out in both its brief and at oral argument that it is not subject to any administrative cleanup order from the Indiana Department of Environmental Management (IDEM), the federal Environmental Protection Agency (EPA), or any other public authority. Thus, Rumpke is not a party that is now or ever has been subject to a civil action under CERCLA § 106, 42 U.S.C. § 9606 (which authorizes the President to bring an action to require responsible parties to clean up sites threatening the environment). It is also undisputed that no party has ever brought a cost recovery action against Rumpke under § 107. Instead, Rumpke has stated that it “intends to act, consistent with the National Contingency Plan, to assure that .the VOCs it has discovered outside of the waste disposal area of the Uniontown Landfill, but within the property boundaries of the Landfill, do not become a threat to health or the environment.” Furthermore, like the district court, on this review from a grant of summary judgment, we assume that Rumpke did nothing to contribute to the presence of the hazardous substances. Its status as a PRP for CERCLA purposes is based solely on its ownership of the Union-town site — ownership, we assume at this stage, it acquired without knowledge of the presence of environmental hazards and after all the deposits had been made.
 

 The question is whether our
 
 Akzo
 
 exception applies to Rumpke: may a landowner
 
 *-344
 
 PRP bring a direct liability suit for cost recovery under § 107(a) against other PRPs (in this case “arrangers”), if it contributed nothing to the hazardous conditions at the site, or is the
 
 Akzo
 
 exception available only to a narrower group of parties, such as the landowner who discovers someone surreptitiously dumping wastes on its land? In this connection, it is useful to review our decision in
 
 Akzo
 
 in somewhat more detail. In that ease, Akzo sued Aigner Corporation and a number of other companies seeking contribution for initial cleanup work it had performed at the Fisher-Calo site and the costs it had incurred in studying the long term cleanup of the site with other PRPs. Akzo itself had sent hazardous wastes to the site. 30 F.3d at 764. It argued nevertheless that it was entitled to bring a direct cost recovery action under § 107(a), because the language of § 107(a) broadly permits any “person” to seek recovery of appropriate cleanup costs.
 
 Id.
 
 at 764. We rejected that argument, noting that:
 

 ... Akzo has experienced no injury of the kind that would typically give rise to a direct claim under section 107(a) — it is not, for example, a landowner forced to clean up hazardous materials that a third party spilled onto its property or that migrated there from adjacent lands. Instead, Akzo itself is a party liable in some measure for the contamination at the Fisher-Calo site, and the gist of Akzo’s claim is that the costs it has incurred should be apportioned equitably amongst itself and the others responsible.... That is a quintessential claim for contribution.
 

 Id.
 
 Both the majority and the dissenting judges agreed, therefore, that Akzo's claim was governed solely by the contribution action § 113(f). In other words, when two parties who both injured the property have a dispute about who pays how much — a derivative liability, apportionment dispute — the statute directs them to § 113(f) and only to § 113(f).
 

 Decisions in this area have not been notable for their clarity. See generally Ann Alexander, “Standing under Superfund §§ 107 and 113: Avoiding the Error of the Blind Man and the Elephant,” 10 BNA Toxics L. Rep. No. 6, at 155 (July 12,1995). The other courts of appeals that have considered the problem have agreed with our conclusion that claims properly characterized as those for contribution may normally be brought only under § 118(f). See,
 
 e.g., Redwing Carriers, Inc. v. Saraland Apartments,
 
 94 F.3d 1489, 1496 (11th Cir.1996);
 
 United States v. Colorado & Eastern R.R. Co.,
 
 50 F.3d 1530, 1534-36 (10th Cir.1995);
 
 United Technologies Corp. v. Browning-Ferns Industries,
 
 33 F.3d 96, 101-03 (1st Cir.1994),
 
 cert. denied,
 
 — U.S. —, 115 S.Ct. 1176, 130 L.Ed.2d 1128 (1995);
 
 Amoco Oil Co. v. Borden, Inc.,
 
 889 F.2d 664, 672 (5th Cir.1989). These cases, like
 
 Akzo,
 
 all involved PRPs who themselves contributed to part of the problem. Also like
 
 Akzo,
 
 at least some of these courts have acknowledged that a class of eases might remain in which a PRP might sue under § 107(a). See
 
 Redwing Carriers,
 
 94 F.3d at 1496;
 
 United Technologies,
 
 33 F.3d at 99 n. 8.
 

 As our
 
 Akzo
 
 decision implied, we see nothing in the language of § 107(a) that would make it unavailable to a party suing to recover for direct injury to its own land, under circumstances where it is not trying to apportion costs
 
 (i.e.,
 
 where it is seeking to recover on a direct liability theory, rather than trying to divide up its own liability for someone else’s injuries among other potentially responsible parties). It is true that liability under § 107(a) is joint and several, and § 113(f) exists for the express purpose of allocating fault among PRPs. See
 
 Town of Munster, Ind. v. Sherwin-Williams,
 
 27 F.3d 1268, 1272 n. 2 (7th Cir.1994);
 
 Environmental Transp. Systems, Inc. v. ENSCO, Inc.,
 
 969 F.2d 503, 508 (7th Cir.1992). Nevertheless, one of two outcomes would follow from a landowner suit under § 107(a): either the facts would establish that the landowner was truly blameless, in which case the other PRPs would be entitled to bring a suit under § 113(f) within three years of the judgment to establish their liability among themselves, or the facts would show that the landowner was also partially responsible, in which case it would not be entitled to recover under its § 107(a) theory and only the § 113(f) claim would go forward. Neither one of those
 
 *-343
 
 outcomes is inconsistent with the statutory scheme promoting allocation of liability.
 

 The statutes of limitations available for § 107(a) and § 113(f) actions also provide no reason for concern. Superficially, it is true that a cost recovery suit under § 107(a) must be brought within six years (roughly speaking — in some circumstances a shorter 3-year period applies), see 42 U.S.C. § 9613(g)(2), while a seemingly shorter 3-year period applies to contribution actions, see 42 U.S.C. § 9613(g)(3). The question is, however, three years from when? Contribution actions may be brought within three years of either the date of judgment in any cost recovery action or within three1 years of the date of an administrative order under §§ 9622(g) or (h), or a judicially approved settlement order. In eases like Rumpke’s, where no prior cost recovery action or applicable order has been entered, it would therefore be impossible to use § 107(a) as a tool for obtaining an advantage for limitations purposes. The contribution claim would not accrue until one of the events specified in § 9613(g)(2) occurred, at which time three years would be available in which to file an appropriate suit.
 

 The language of § 113(f) also suggests that Rumpke’s § 107(a) suit is consistent with the statute as a whole. Section 113(f)(1) begins with the following sentence:
 

 Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) [sec. 107(a) ] of this title, during or following any civil action under section 9606 [see. 106] of this title or under section 9607(a) of this title.
 

 Because neither a § 106 nor a § 107(a) proceeding has been concluded, Rumpke’s action obviously does not “follow” such an action. Rumpke has brought its own § 107(a) action, in Count I of its complaint. If it turns out that Rumpke is not the innocent party it portrays itself to be, then Rumpke will not qualify for the
 
 Akzo
 
 exception. It would still be entitled to seek contribution for its expenses from the other PRPs, assuming it met the requirements of § 113(f)(1). (We acknowledge, as other courts have, that this seems to provide a disincentive for parties voluntarily to undertake cleanup operations, because a § 106 or § 107(a) action apparently must either be ongoing or already completed before § 113(f)(1) is available. This appears to be what the statute requires, however.)
 

 If one were to read § 107(a) as implicitly denying standing to sue even to landowners like Rumpke who did not create the hazardous conditions, this would come perilously close to reading § 107(a) itself out of the statute. As one district court in New Jersey recognized, this position would “mean that Section 107(a) private party plaintiffs will be few and far between. Truly innocent private party plaintiffs would be limited to, for example, a neighbor of a contaminated site who has acted to stem threatened releases for which he is not responsible, see
 
 Akzo,
 
 30 F.3d at 764, or a party who can claim one of the complete defenses set forth in 42 U.S.C. § 9607(b).”
 
 Stearns & Foster Bedding Co. v. Franklin Holding Corp.,
 
 947 F.Supp. 790, 801 (D.N.J. 1996). Notwithstanding that observation, the New Jersey district court adopted the narrower approach to § 107(a), relying in part on a rather narrow reading of our
 
 Akzo
 
 opinion. We disagree, however, that
 
 Akzo
 
 requires such a result, or that it would be consistent with the broader purpose and structure of CERCLA. We conclude instead that landowners who allege that they did not pollute the site in any way may sue for their direct response costs under § 107(a). To the extent this looks like an implied claim for contribution, where the landowner is alleging that its share should be zero, we note that dicta in the Supreme Court’s decision in
 
 Key Tronic Corp. v. United States,
 
 511 U.S. 809, 114 S.Ct. 1960, 128 L.Ed.2d 797 (1994), suggests that the Court was not disturbed by that possibility. See 511 U.S. at 816, 114 S.Ct. at 1967.
 

 Rumpke, as a landowner seeking to recover for direct injury to its property inflicted by the Cummins group, was therefore entitled to sue under § 107(a). Unlike the plaintiff in
 
 Akzo,
 
 Rumpke alleges that it was not responsible for any of the waste at the Uniontown site. On the basis of the present record, we must regard it as a landowner on whose property others dumped hazardous materials, before Rumpke even owned the
 
 *-342
 
 property. We see
 
 no
 
 distinction between this situation and a case where a landowner discovers that someone has been surreptitiously dumping hazardous materials on property it already owns, apart from the potentially more difficult question of fact about the landowner’s own responsibility in the latter case.
 

 Last, we must consider whether the contribution bar of § 113(f)(2) has any role to play in a direct cost recovery action under § 107(a). We conclude that it does not. The theory of a direct cost recovery action is that other parties must pay Rumpke for the cost of restoring the property. Contribution among the defendants could be of no possible benefit to a party entitled to recover its full direct costs, nor could the settlement carve-out feature of § 113(f)(2) be of any possible benefit to Rumpke as a Uniontown PRP. Cummins conceded at oral argument that its
 
 Seymour
 
 settlement will not and cannot reduce Rumpke’s liability as a landowner of Uniontown by as much as a penny. This means that § 113(f)(2) has no role to play insofar as this is a direct liability action under § 107(a)(1).
 

 2.
 
 Rumpke’s § 113(f)(1) claim. If
 
 the facts show, contrary to Rumpke’s protestations, that it was partially responsible for the mess át Uniontown,
 
 Akzo
 
 holds that it can proceed only under § 113(f)(1) in a suit for contribution. In that case, the scope of the settlement bar of § 113(f)(2) would become important. We therefore turn to the question whether the 1982
 
 Seymour
 
 settlement addressed the Cummins defendants’ liability for sites other than the Seymour site itself.
 

 B. Matters Addressed in the Settlement
 

 The starting point for our analysis of this question is, as we noted in
 
 Akzo,
 
 the language of the consent decree itself. We said there that “the ‘matters addressed’ by a consent decree must be assessed in a manner consistent with both the reasonable expectations of the signatories and the equitable apportionment of costs that Congress has envisioned.” 30 F.3d at 766 (citation omitted). This does not mean that the language of the decree is subject to an ill-defined equitable trump card; the congressional intent was viewed instead as something like a canon of construction for the language of the decree. The
 
 Akzo
 
 majority was especially concerned about the potential for negotiated consent decrees to affect third-party rights, through the contribution bar of § 113(f)(2). The statute itself addresses this problem directly, by making the contribution bar applicable only for administrative and judicially approved settlements, rather than to every private settlement that might be negotiated. In keeping with this extra care, Akzo held that terms in a decree that are especially likely to affect third-party rights must be more explicit. See
 
 id.
 
 at 766 n. 8, 768. Using this approach, the court concluded that the consent decree before it did not bar Akzo’s claim, largely because “Akzo’s work [stood] apart in kind, context, and time from the work envisioned in the consent decree....”
 
 Id.
 
 at 767.
 

 None of the factors found important in Akzo suggest that the 1982
 
 Seymour
 
 decree addressed the settling parties’ liability for waste from Seymour Recycling dumped at virtually any or every other spot on the globe, including the Uniontown landfill. Rumpke’s Uniontown work is apart in “kind, context, and time” from the Seymour surface cleanup. The decree defined, very specifically, the parties’ responsibilities for the Seymour Recycling site in Seymour, Indiana. For example, Exhibit B of the decree defined the decree’s object as “The Removal and Disposal of Drummed Hazardous Chemicals and Waste Materials Located at: Seymour Recycling Center[,] Seymour, Indiana.” Section VIII of the decree gave the United States, the State, and their authorized representatives “access to the Seymour site at all times until such time as the Work is completed.” Section IX allowed the various governmental authorities “access to the site for the sampling of wastes at the site....” Section XII itself, on which the Cummins group has pinned its hopes, declared it to be the intention of the parties “[t]o avoid litigation ... in connection with the Seymour site....”
 

 Read as a whole, we do not find the decree to be ambiguous. The Cummins defendants
 
 *-341
 
 read far too much into their ellipsis-ridden phrase “arising out of ... the ... transportation ... of any materials ... from ... the Seymour site,” when they claim that this covers all transshipments away from the site. If we are playing with ellipses, we could also say that the decree covers matters “arising out of the ... transportation ... of any materials ... near the Seymour site,” but even Cummins’ lawyer agreed that it would be absurd to conclude that the Cummins group was protected even if any of its wastes had ever been “near” Seymour, perhaps passing on their way to Uniontown or other locales.
 

 We agree with the district court that section XII of the consent decree makes both internal sense and fits in with the entirety of the settlement quite comfortably if the word “from” is understood to relate to more modest phenomena such as leaching and other similar leakage from the Seymour site itself. This assures us that none of the language is superfluous, as required by general contract principles. See Restatement (Second) of Contracts § 203(a) (1979) (stating that it is preferable to interpret language in contracts such that all language has meaning and effect). The Cummins group is protected from liability for matters directly related to the Seymour site; the decree does not have the global reach they have urged here.
 

 Because we find the decree clear on its face, it is neither necessary nor appropriate to consider the defendants’ extrinsic evidence, including affidavits from the settling defendants’ lawyer about what he really meant in approving the language of section XII.
 
 United States v. Armour & Co.,
 
 402 U.S. 673, 682, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971) (noting that normally, “the scope of a consent decree must be discerned within its four corners”). See also
 
 Firefighters Local Union No. 1784 v. Stotts,
 
 467 U.S. 561, 573, 104 S.Ct. 2576, 2585, 81 L.Ed.2d 483 (1984) (quoting Armour);
 
 United States v. ITT Continental Baking Co.,
 
 420 U.S. 223, 237, 95 S.Ct. 926, 934-35, 43 L.Ed.2d 148 (1975) (plain meaning approach set out in
 
 Armour
 
 applies when court is simply determining whether the parties have violated the consent decree);
 
 Goluba v. School Dist. of Ripon,
 
 45 F.3d 1035, 1038 (7th Cir.1995) (explicit terms of consent decree control unless terms are facially ambiguous). This decree settled the defendants’ liability for the Seymour site, not others.
 

 In response to the district court’s first two questions, we reiterate our holding in
 
 Akzo
 
 that nothing in the pertinent environmental statutes
 
 theoretically
 
 limits the power of the United States to enter into a settlement that addresses moré than one facility. See
 
 Akzo,
 
 30 F.3d at 766 n. 8, 768. In keeping with the approach we endorsed in
 
 Akzo,
 
 however, the intent to sweep more than one site into a settlement agreement must appear far more plainly in the language of the agreement than we have here. Pulling a few words out, with strategic ellipses, from a boilerplate list, where the entire remainder of the consent decree deals with one and only one site, is not enough to accomplish the global settlement goal.
 

 We therefore Affirm the district court’s order denying summary judgment based on the 1982 consent decree to Cummins Engine and its co-defendants, and granting partial summary judgment on this issue to Rumpke.