Nicholas ESTES, d/b/a Estes Industrial Center, Plaintiff,

v.

SCOTSMAN GROUP, INC., Defendant.

No. 98–1072.

United States District Court, C.D. Illinois.

Aug. 27, 1998.

John C. Mulgrew, Heyl Royster Voelker & Allen, Peoria, IL, for Plaintiff.

Stanley L. Tucker, Hartzell, Glidden, Tucker and Hartzell, Carthage, IL, Luke DeGrand, Luke DeGrand, Donald C. Clark, Jr., Clark & DeGrand, Chicago, IL, for Defendant.

### ORDER

MIHM, Chief Judge.

This matter is before the Court on Defendant, Scotsman Group, Inc.'s ("Scotsman"), Motion to Dismiss or in the Alternative for Summary Judgement [1] [# 8]. For the rea-

---

1. The Court will treat this as a motion for summary judgment pursuant to Federal Rule of Civil Procedure 12(c) which states, "[i]f, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56. . . ."

sons stated below, the Motion for Summary Judgment [# 8] is GRANTED. This case is now TERMINATED.

### Background

Plaintiff, Nicholas Estes ("Estes"), is an Illinois citizen doing business as Estes Industrial Center in Macomb, Illinois. He acquired title to the subject site (the "Estes Site") by warranty deeds dated March 12, 1986 and June 25, 1986.

Before Estes purchased the Estes Site, King–Seeley Thermos Co. ("KST") operated a manufacturing plant there. When KST closed its manufacturing business, it was given, on September 10, 1985, a certificate of compliance from the Illinois Environmental Protection Agency ("IEPA"). On or about March 21, 1989, KST, a wholly-owned subsidiary of Household Manufacturing Inc. ("HMI"), was merged into Defendant, Scotsman Group, Inc., a foreign corporation doing business in Illinois.

Sometime between the date of Estes' purchase of the site and April 12, 1990, Estes discovered a sludge pit containing levels of barium and cadmium (hereinafter referred to as "blue sludge") on the Estes Site.

Without notifying the required authorities or obtaining the required permit under the Resource Conservation and Recovery Act ("RCRA"), Estes removed the blue sludge from the pit and piled it, untreated and uncovered, onto the soil outside of a building on the Estes Site. He also failed to provide any means of controlling the run-off from the waste pile. It is uncontested that in violation of environmental guidelines, Estes moved the blue sludge into two containers and moved the containers to two locations within the facility. The blue sludge was eventually shipped off site, but the contaminated containers remained. He admits that as a result of his subsequent removal and handling of the blue sludge, the IEPA considered the blue sludge to constitute an "unpermitted hazardous waste management unit". However, prior to his purchase of the property, he had no knowledge that it was contaminated.

In 1990, Estes sought financing to make improvements on the property, and the lending institution required that an environmental assessment be performed. Assessments and subsequent site investigations indicated the presence of volatile organic compounds ("VOCs") and cadmium and chromium in the groundwater and soil on the site as well as trace amounts in the surrounding neighborhoods. The investigations also revealed onsite soil and groundwater contamination of VOCs, among them trichloroethylene and 1,2 dichloroethene, compounds which have been designated as hazardous substances and waste by the EPA. *See* 40 C.F.R. § 302.4.

The IEPA conducted inspections of the Estes Site on January 18, 1990, January 24, 1990, April 12, 1990, September 19, 1991, January 23, 1992, October 22, 1992, and November 16, 1994. On June 7, 1990, the IEPA sent Estes a letter detailing over 35 apparent violations of the Illinois Environmental Protection Act ("the Act") and the rules and regulations adopted thereunder.

After Estes discovered the blue sludge, HMI (parent corporation of KST which subsequently merged with Scotsman), became involved in investigation of activities at the site, and on June 11, 1991, Estes and HMI entered into a letter agreement ("Letter Agreement") relating to the handling of environmental issues at the Estes Site. Under the Letter Agreement, "Estes was to continue to take the lead on all blue sludge issues" and HMI was "to take the lead on the groundwater and soil investigation and remediation issues unrelated to the blue sludge." (Def.Exh. # 7 to Stmt. of Uncontested. Facts). In the agreement, both parties reserved the right to seek reimbursement from one another.

On May 3, 1994, the attorney for Estes, Brent Gwillim, was sent an Enforcement Notice Letter by the IEPA setting forth 25 violations by Estes of the Act. On July 8, 1996, a complaint was filed against Estes by the Illinois Attorney General on behalf of the IEPA. *People of the State of Illinois ex rel. James E. Ryan v. Nicholas Estes d/b/a Estes Industrial Center*, No. 96–CH–7 (Circuit Court of the Ninth Judicial Circuit, McDonough County, Illinois). The Complaint alleged the following counts against Estes:

Count I Unpermitted Storage of Hazardous Waste

Count II Failure to Analyze Waste

Count III Failure to Train Personnel

Count IV Improper Maintenance of Facility

Count V Failure to Make or Coordinate Contingency Plan

Count VI Inadequate Recordkeeping and Reporting

Count VII Containment Violations

Count VIII Inadequate Security Measures

Count IX Groundwater Monitoring Violations

Count X Improper Storage of Containerized Hazardous Wastes

Count XI Closure/Post Closure Violations

Count XII Water Pollution

Under a Consent Order, Estes was required to pay a $750.00 fine, cease and desist from any further violations of the Act, and undertake at his own expense certain remedial work including the excavation of contaminated soil and the triple washing and rinsing of the contaminated containers.

On September 29, 1997, HMI received a "No Further Remediation Letter" from the IEPA relating to the Estes Site. This letter states that it "signifies a release from further responsibilities under the Illinois Environmental Act." It also states that it shall be "considered prima facie evidence that the remediation site described in the attached Site Remediation Program ("SRP") Environmental Notice and shown in the attached Site Base Map does not constitute a threat to human health and the environment and does not require further remediation under the Act if utilized in accordance with the terms of this Letter." Moreover, the letter released both HMI and Estes. Estes is a signatory of the "No Further Remediation Letter." There was no action filed against Estes under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§ 9606, 9607(a), or 9613(f)(1).

After receiving the "No Further Remediation Letter," Estes filed a two-count CERCLA Complaint, attempting to recover some or all of the costs incurred in the cleanup and seeking a declaration as to liability for future costs to. Count I seeks cost recovery pursuant to § 107(a) of CERCLA, 42 U.S.C. § 9607(a). Count II seeks contribution for response costs pursuant to § 113(f) of CERCLA, 42 U.S.C. § 9613(f).

## Discussion

A motion for summary judgment will be granted where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). The moving party has the responsibility of informing the Court of portions of the record or affidavits that demonstrate the absence of a triable issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The moving party may meet its burden of showing an absence of material facts by demonstrating "that there is an absence of evidence to support the non-moving party's case." *Id.* at 2553. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986); *Cain v. Lane*, 857 F.2d 1139, 1142 (7th Cir.1988).

If the moving party. meets its burden, the non-moving party then has the burden of presenting specific facts to show that there is a genuine issue of material fact. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). Federal Rule of Civil Procedure 56(e) requires the non-moving party to go beyond the pleadings and produce evidence of a genuine issue for trial. *Celotex Corp.*, 106 S.Ct. at 2553. This Court must then determine whether there is a need for trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may be reasonably resolved in favor of either party. *Anderson*, 106 S.Ct. at 2511.

Scotsman sets forth four arguments why it is not responsible for a portion or the entire amount of the costs Estes incurred: 1) Estes was in some measure responsible for the contamination, and as such, is barred from bring suit under § 107(a) of CERCLA, 42 U.S.C. § 9607(a); 2) Estes cannot seek contribution costs under § 113(f) of CERCLA, 42 U.S.C. § 9613(f), without being a defen-

dant in a § 106 or § 107 action; 3) Estes is barred from any relief under CERCLA (§ 107(a) or 113(f)) because his response costs were not consistent with the National Oil and Hazardous Substances Pollution Contingency Plan ("NCP"); [2] and 4) a declaration as to future liability is unnecessary in light of the IEPA's "No Further Remediation Letter." (Def. Br. in Supp. of Mot. to Dismiss or for Summ. J. at 5–6).

CERCLA has been the focus of much litigation. One recurring controversy is how to classify a claim brought by a potential CERCLA defendant, a "potentially responsible party" ("PRP"), against another PRP.[3] This question arises because two separate sections of CERCLA provide two potential avenues for recovery.

Section 107(a) provides a "cost recovery" action for governmental entities and private parties who clean up contaminated sites. Liability is joint and several. Section 107(a) reads in pertinent part that PRPs (e.g., owners, operators, transporters) shall be liable for:

> (A) all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan;
>
> (B) any other necessary costs of response incurred by any other person consistent with the national contingency plan.

42 U.S.C. § 9607(a)(4).

Section 113(f) provides a cause of action for "contribution" for those upon whom liability is imposed. The statute reads in part that:

> Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, during or following any civil action under section 9606 of this title or under section 9607(a) of this title. Such claims shall be brought in accordance with this section and the Federal Rules of Civil Procedure, and shall be governed by Federal law. In

resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate. Nothing is this subsection shall diminish the right of any person to bring an action for contribution in the absence of a civil action under section 9606 of this title or section 9607 of this title.

42 U.S.C. § 9613(f)(1).

I. *Count I, Section 107(a), should be dismissed because Estes is not within the innocent landowner PRP exception.*

The first issue is whether a § 107 claim may be brought by one PRP against another PRP. In Count I, Estes seeks cost recovery under § 107(a) of CERCLA. Scotsman asserts that Estes' claim fails as a matter of law because Estes is a PRP who is in some measure responsible and, consequently, does not fall within the innocent landowner exception which exists in the Seventh Circuit. (Def. Br. in Supp. of Mot. to Dismiss or for Summ. J. at 7). This Court agrees.

 The case law is fairly clear in the Seventh Circuit with regard to the issue of which parties have standing to sue under § 107(a). Parties who are liable in some measure for the contamination are prevented from bringing suit under § 107(a). When one PRP brings suit against another PRP, the claim is "a quintessential claim for contribution" falling under § 113. *Akzo Coatings, Inc. v. Aigner Corp.*, 30 F.3d 761, 764 (7th Cir.1994). This ruling was followed in *Rumpke of Indiana, Inc. v. Cummins Engine Co., Inc.*, 107 F.3d 1235 (7th Cir.1997), where the Seventh Circuit held, "[w]hen two parties who both injured the property have a dispute about who pays how much—a derivative liability, apportionment dispute—the statute directs them to § 113(f) and only to § 113(f)." *Id.* at 1240. Accordingly, the general rule in this Circuit is that PRPs are liable under § 113(f), not § 107(a). Estes, as the current owner and operator of the prop-

---

2. The NCP is published at 40 C.F.R. pt. 300.

3. CERCLA's legislative history is sparse, and some of its provisions are unclear and seemingly contradictory. An issue which has generated much litigation is the allocation of costs between

two PRPs. See *Cost Recovery or Contribution?: Resolving the Controversy over CERCLA Claims Brought by Potentially Responsible Parties.* 21 Harv Envtl.L.Rev. 83 (1997).

erty, is a PRP as defined by 42 U.S.C. § 1907(a)(1).

The Seventh Circuit has created an exception to this rule and has allowed "innocent landowner" PRPs to recover under § 107. In *Rumpke*, a purchaser of a dump where waste had been migrating from miles away for years was able to recover under § 107(a). The court held, "[w]e conclude instead that landowners who allege that they did not pollute the site in any way may sue for their direct response costs under § 107(a)." *Id.* at 1241.

This exception was also acknowledged in *Akzo Coatings*, when the court held:

> Yet, Azko has experienced no injury of the kind that would typically give rise to a direct claim under section 107(a)—it is not, for example, a landowner forced to clean up hazardous materials that a third party spilled onto its property or that migrated there from adjacent lands. *Instead, Azko itself is a party liable in some measure for the contamination* at the Fisher–Calo site, and the gist of Azko's claim is that the costs it has incurred should be apportioned equitably amongst itself and the others responsible. That is a quintessential claim for contribution.

*Akzo Coatings*, 30 F.3d at 764 (emphasis added).

██ Like Azko, Estes is not an "innocent landowner". It is undisputed that Estes, without notifying the required authorities or obtaining the required permit, removed the blue sludge from the pit and piled it, untreated and uncovered, onto the soil outside of a building on the Estes Site. Further, Estes concedes that he failed to provide any means of controlling the run-off from the waste. Moreover, he admitted that he moved the blue sludge into two containers and moved the containers to two locations within the facility before moving the blue sludge off site. (Pl.'s Resp. to Def. Stmt. of Uncontested Facts at 4). The cleanup costs relating to the blue sludge contamination were partially created by Estes because of his unauthorized management of the waste. Accordingly, Estes does not come within the exception to the general rule and therefore is not entitled to relief under § 107(a).

*Amcast Indus. Corp. v. Detrex Corp.*, 2 F.3d 746 (7th Cir.1993), initially does appear to contradict *Akzo* because it held "the statute permits one responsible person to recover all or part of its response costs from another." *Id.* at 748. However, the court in *Amcast* never addressed the question of whether a PRP can bring suit only under § 113, and the ruling in *Akzo* was subsequently upheld in *Rumpke* and again in *AM Intern., Inc. v. Datacard Corp.*, 106 F.3d 1342 (7th Cir.1997). This Court agrees with another court's reconciliation of *Akzo* and *Amcast.* The court in *Ninth Avenue Remedial Group v. Allis Chalmers*, 974 F.Supp. 684, 689 (N.D.Ind.1997), held:

> The Court cannot ignore *Akzo* solely based on the implications of *Amcast.* The Seventh Circuit have subsequently endorsed *Akzo* in *Rumpke* and in *AM Intern.* In addition, the final outcome in Amcast may stand even in light of *Akzo* because the PRP innocent landlord exception to the *Akzo* ruling likely applied to the plaintiff in *Amcast.*

*Id.* at 690.

The present case is distinguishable from *AM Intern.*, to which Estes cites. There, a purchaser of contaminated land who had not contributed to the contamination, but knew about it, was able to bring a § 107(a) suit. The purchaser paid less for the land because it was contaminated. The court found that this knowledge, coupled with his status as a PRP, based solely because he was a landowner, made him "a little less 'innocent' than the landowner in *Akzo* . . . ." *Id.*, however, the court found, nevertheless, that the defendant was entitled to bring suit under § 107(a) because it came within the *Akzo* "innocent landowner" exception.

Estes, unlike the plaintiff in *AM Intern.*, did not contact the EPA immediately concerning the contamination, but instead attempted self-help procedures to rid the site of the blue sludge. When Estes' self-help procedures violated IEPA regulations, the problem was brought to the IEPA's attention. While the defendant in *AM Intern.* had knowledge of contamination before buying

the property, it, unlike Estes, did not perpetrate any environmental violations.

Estes is also unlike the purchaser of contaminated soil in *Raytheon Co. v. McGraw–Edison Co.,* 979 F.Supp. 858, 864–65 (E.D.Wis.1997). While both Estes and Raytheon excavated, stored, and disposed of contaminated soil, the similarities end there. Immediately after it discovered the contamination, Raytheon contacted the Wisconsin Department of Natural Resources. Raytheon then, under the Department's guidance, investigated the contamination. During this investigation, the excavated soil remained stockpiled on the site. In this case, Estes did not voluntarily go to the IEPA upon discovering the contamination.

Estes urges this Court to follow the dictum cited from *Key Tronic Corp. v. United States,* 511 U.S. 809, 114 S.Ct. 1960, 128 L.Ed.2d 797 (1994). However, *Key Tronic* addressed a different issue; namely, whether attorney's fees were recoverable as part of the plaintiff's response costs. The Supreme Court, looking at § 113(f) noted, "the statute now expressly authorizes a cause of action for contribution in § 113 and impliedly authorizes a similar and somewhat overlapping remedy in § 107." *Id.* at 1966. Accordingly, *Key Tronic* deals with what is properly recoverable as a component of response cost, not who may recover under the statutory scheme. In sum, as Estes does not qualify as an "innocent landowner," his § 107(a) claim fails.

II. *Count II, Section 113(f), should be dismissed because there is no § 106 or § 107 claim pending.*

█ Scotsman asserts that Count II (Estes' § 113(f) claim) should be dismissed because there has not been a § 106 or § 107 proceeding brought against him. Estes argues that the language of the statute prevails over the language of *Rumpke* and that the two district court cases Scotsman relies on torture the statutory language. Because of indistinguishable authority in the Seventh Circuit, this Court concludes that Estes has no recourse under § 113(f).

As noted earlier, the confusion stems from the wording of § 113(f), which states:

Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, during or following any civil action under section 9606 of this title or under section 9607(a) of this title. Such claims shall be brought in accordance with this section and the Federal Rules of Civil Procedure, and shall be governed by Federal law. In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate. Nothing is this subsection shall diminish the right of any person to bring an action for contribution in the absence of a civil action under section 9606 of this title or section 9607 of this title.

42 U.S.C. § 9613(f)(1). Scotsman cites the first sentence in support of its argument, while Estes cites the last.

In *Rumpke,* the only case to address this issue, the Seventh Circuit held that a § 106 or § 107(a) action must be brought against a PRP plaintiff in order for the PRP plaintiff to bring a contribution action under § 113(f). The *Rumpke* court stated:

We acknowledge, as other courts have, that this seems to provide a disincentive for parties voluntarily to undertake cleanup operations, because a § 106 or § 107(a) action apparently must either be ongoing or already completed before § 113(f)(1) is available. This appears to be what the statute requires, however.

*Rumpke,* 107 F.3d at 1241. The Seventh Circuit was aware it was creating a disincentive for voluntary cleanup but nevertheless interpreted the statute to require a § 106 or § 107(a) action to be either ongoing or completed.

Additionally, in the case of *Rockwell Intern. Corp. v. IU Intern. Corp.,* 702 F.Supp. 1384, 1389 (N.D.Ill.1988), the court concluded that § 107(a) liability is a prerequisite to a claim under § 113(f). The court held, "we view the last sentence of § 9613(f), [ § 113(f) ], not as derogating from the requirement that a finding of liability precede any award in contribution, but as an assurance that contribution remains available in

other contexts, such as through Rockwell's claims for contribution under Illinois law." *Id.*

In attempting to give the entire statute effect, the language in *Rumpke* as well as the *Rockwell* interpretation appear correct. Moreover, as noted in *PMC v. Sherwin-Williams Co.,* 1997 WL 223060, at *10 (N.D.Ill. April 29, 1997), "CERCLA is a complicated regulatory scheme, adherence to which Congress made more important than making 'CERCLA an unlimited vehicle for cleanup cost recovery.'" *PMC,* 1997 WL 223060, at *10.

This Court cannot agree with Estes in his reliance on *Ninth Avenue,* which stated:

> In light of the express language of Section 113(f)(1), this Court will not be guided by the equivocal dicta in *Rumpke.* Without a direct holding from the Seventh Circuit to the contrary, this Court finds that PRP can bring a section 113 action even when no prior or pending section 106 or 107 civil actions have occurred.

*Ninth Avenue,* 974 F.Supp. at 691.

Estes also makes an Illinois common law argument. However, he fails to inform the Court how Illinois common law or Illinois civil procedure control in light of relevant Seventh Circuit authority and the requirements of the statute. Therefore, Count II is dismissed for want of a § 106 or § 107 proceeding against Estes.

### III. *Estes is barred from recovery under either § 107 or § 113 because his response costs were not consistent with the NCP.*

Even assuming that Estes fell within the innocent landowner exception or this Court had concluded that a § 106 or § 107 claim was not a prerequisite for contribution, Estes would still have to show that his cleanup was consistent with the NCP in order to recover. He fails to do so, however.

The NCP is required by CERCLA and must be complied with in order to recover under § 107 or § 113. It is a set of criteria describing the procedures and standards for responding to hazardous waste releases. The NCP contains a community relations (or public comment requirements) provision which is the focus of this issue.

The issue of whether Estes response was consistent with the NCP involves two sub-issues. The first is whether failure to comply with the community relations requirements is a material departure from the NCP. The second issue is whether a public agency may substitute for these requirements of the NCP.

Scotsman contends that recovery under §§ 107(a) and 113(f) is only available if the party seeking recovery complies with the NCP, specifically the public comment requirements, and that Estes has failed to do so. Estes does not argue that he must comply with the public comment requirements of the NCP, but responds that the IEPA's involvement serves as a substitute for such requirements. Based on the language of § 9607 and case law, this Court cannot agree with Estes.

### A. *Compliance with public comment section is material.*

To be considered "consistent with the NCP," the action, evaluated as a whole, must be in substantial compliance with the requirements of paragraphs 5 and 6 of § 300.700. 40 C.F.R. § 300.700(c)(3)(*l* ). Paragraph 6 requires that the party undertaking the action provide an opportunity for public comment concerning the selection of a private party response. 40 C.F.R. § 300.700(c)(6). Furthermore, the "EPA does not believe that the failure of a private party to provide a public hearing should serve to defeat a cost recovery action *if the public was afforded an ample opportunity for comment.*" 55 Fed.Reg. 8666, 8766 (1990) (emphasis added).

■ Neither the Seventh Circuit nor the other courts of appeal has spoken on the issue of whether compliance with the public notice requirements of the 1990 NCP is material, but the majority of district courts to consider the issue have concluded that it is. *See PMC,* 1997 WL 223060, at *8. Also, "[n]otice to the public and opportunity to comment must be provided regardless of whether a removal or remedial action is per-

formed." *G.J. Leasing Co., Inc. v. Union Electric Co.,* 854 F.Supp. 539, 566 (S.D.Ill. 1994), *aff'd,* 54 F.3d 379 (7th Cir.1995).

Other courts, including some in the Seventh Circuit, have held that the plaintiff "did nothing to obtain public input and therefore has not substantially complied with the NCP." *Alcan–Toyo America v. Northern Illinois Gas,* 904 F.Supp. 833, 837 (N.D.Ill. 1995). *See also Gussin Enterprises, Inc. v. Rockola,* 1993 WL 114643, at *4 (N.D.Ill. April 13, 1993); *County Line Inv. Co. v. Tinney,* 933 F.2d 1508, 1512 (10th Cir.1991).

■ Finally, the fact that the NCP lists the public comment requirements in two separate subsections of the requirements for consistency with the NCP suggests that inability to meet the requirement is not an "immaterial or insubstantial deviation" from the NCP's requirements. *PMC,* 1997 WL 223060, at *8, citing *Alcan–Toyo America,* 904 F.Supp. at 836. Accordingly, this Court finds compliance with the public comment requirements of the NCP is material.

B. *Public agency involvement may under certain conditions substitute for the public comment requirement, but such a situation does not exist here.*

Cases allowing public agency involvement to be substituted for public comment have only allowed such a substitution if the public is provided an ample opportunity for comment and there is substantial involvement throughout the cleanup by a state agency.

This case is similar in level of public involvement to a case within the Seventh Circuit, *VME Americas, Inc. v. Hein–Werner Corp.* ., 946 F.Supp. 683 (E.D.Wis.1996). In *VME Americas,* the public was not put on notice, and there was no public interaction. The company had little interaction with the state agency. The court held:

VME will no doubt be frustrated by this result, and understandably so. VME acted responsibly throughout this cleanup. It discovered a problem on the property that was not of its own making. It immediately reported the problem to the authorities, investigated the extent of the contamination, and then took responsibili-

ty for cleaning it up. Moreover, all the evidence indicates that VME chose the most cost-effective solution to the problem and more importantly, one that worked. On such a record, it seems a bit unfair for Hein–Werner, the likely source of the contamination, to escape much of the financial responsibility for cleaning it up. But that is what the law requires. Compliance with the NCP is [not] reducible to an inquiry into whether the cleanup was cost-efficient and environmentally sound.... In cases like this, the regulatory scheme may seem unduly scrupulous and inflexible, but this highlights the limited nature of the federal remedy.

*Id.* at 692 (internal citations omitted).

■ In the present case, there was no opportunity for public comment, nor was there active state agency involvement. While the IEPA approved a plan developed by Estes, the agency merely received monthly status reports and a final report.

The two cases Estes cites are factually distinguishable from the case at bar. In *American Color and Chemical Corp. v. Tenneco Polymers, Inc.,* 918 F.Supp. 945, 956 (D.S.C.1995), the court found that public involvement was sufficient because meetings were held with the county council and other concerned citizens after the contamination was originally discovered and newspaper coverage apprised the public of the remediation. *Id.* at 949–55.

In *General Electric Co. v. Litton Business Systems, Inc.,* 715 F.Supp. 949 (W.D.Mo. 1989), the court held that the input of the Missouri Department of Natural Resources serves as a substitute for public comment because, pursuant to the Missouri statutes, the Hazardous Waste Management Commission held public meetings on three separate occasions which members of the public attended, and there was prior published public notice of the meetings. *Id.* at 952.

Again, these cases are factually distinguishable from the case sub judicia. Both cases involve public agency involvement and the public being made aware of the situation.

It is clear from the record that the public was in no way involved with the issues relat-

ed to the cleanup. Accordingly, for this reason alone, Estes' claims under both § 107 and § 113 fail.

### IV. *Declaration as to future liability.*

Estes asks the Court to enter declaratory judgment with respect to responsibility of future response costs at the Estes Site that might be incurred by him, the IEPA, or the EPA. Based on the reasons set forth above, this appears moot.

### Conclusion

For the reasons stated above, the Motion for Summary Judgment [# 8] is GRANTED. This case is now TERMINATED.