358 F.3d 678
 WESTERN PROPERTIES SERVICE CORPORATION, an Arizona corporation, Plaintiff-Appellee,
v.
SHELL OIL COMPANY, a Delaware corporation; Union Oil Company, a California corporation; Texaco, Inc., a Delaware corporation; Atlantic Richfield Company, a Delaware corporation, Defendants-Appellants.
 No. 01-55676.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted May 8, 2002 — Pasadena, California.
 Filed February 13, 2004.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Peter R. Taft, Munger, Tolles & Olson LLP, Los Angeles, CA, for the appellants.
 Jaclyn C. Taner, Federal Deposit Insurance Corporation, Washington, DC, for the appellee.
 Appeal from the United States District Court for the Central District of California; Carlos R. Moreno, District Judge, Presiding. D.C. No. CV-94-04695-CM.
 Before Andrew J. KLEINFELD and Susan P. GRABER, Circuit Judges, and Susan R. BOLTON,* District Judge.
 Opinion by Judge Kleinfeld.
 OPINION
 KLEINFELD, Circuit Judge:
 
 
 1
 This is a CERCLA contribution case.[1] The appellants were found to have arranged, during the early years of World War II, for the disposal of wastes from aviation fuel production.
 
 FACTS
 
 2
 The property at issue, near Corona, in Riverside County, California, was once a ranch owned by the Wardlows. Gravel had been excavated from the property in 1938 for a nearby dam, leaving four gravel pits. For $2,000, the Wardlows sold the right to dump "acid tar" — petroleum waste consisting in substantial part of sulfuric acid — into those pits. Oil refineries, for over a decade by then, had been going farther and farther afield from their Long Beach locations for disposal sites because the stink of acid tar was notoriously offensive to neighbors. This sludge could be smelled from almost a mile away. Burning did not solve the problem, and the fumes were so bad that they killed flowers and fruit trees. Runoff from the waste made farmland useless and killed fish in nearby streams.
 
 
 3
 Among the central difficulties in this case is that it is hard to say what the facts are, as the parties could find no living person who knows what happened, and documentary evidence supports nothing more than inferences. The actions giving rise to the claim were performed (if indeed they were) in 1941 and 1942.
 
 
 4
 Elma Wardlow, who survived into this litigation, might have been a good source of information. But when plaintiff Western Properties' attorneys attempted to talk to her in the mid '90s, "she was in an Arizona rest home, infirm, and completely unable to respond to questions (Mrs. Wardlow's daughter was present during the efforts to talk with her)."[2] Years before, she had written that "[a] man named Carl Bliss with the sand and gravel company is the one who made arrangements for the dumping. He is deceased."[3] She noted in the same letter that the sulfuric acid sludge came from "an oil company (name unknown) in Long Beach." Contemporaneous reports identify the Wardlows' customer or customers only as "ethyl gasoline refining operations" in Wilmington, California.[4]
 
 
 5
 By the end of January 1942, the first of the four pits was full, and the neighbors were protesting the stink and the threat to their water supplies. County supervisors directed the county attorney to draw up an ordinance they could pass to prevent further dumping. In February, the county attorney wrote a memorandum to the board of supervisors saying that he had met with "Mr. [Eli] McColl, representing the major oil companies and connected with the Refiners' Committee on Waste Disposal."[5] They agreed that in the future no Riverside County site would be used without approval of the County Health Officer and the Pollution Control Department of the California Division of Fish and Game. The memorandum does not state which oil companies McColl represented or which ones had been dumping sludge in the pits provided by the Wardlows. By June of 1942, McColl had arranged for a different site, and the dumping at the Wardlow site had ended. McColl died before this litigation began, so he could not identify which oil companies' wastes he had arranged to have dumped in the Wardlows' gravel pits.
 
 
 6
 The Wardlows sold the property in 1946 to some people named Thomas, and it came to be known as Thomas Ranch. The sludge was still conspicuously present. The gravel pits had become acid filled tar pits that ate cows. One local paper reported that "[a]s the years passed a crust of varying thickness formed over the top.... Animals that ventured too far out upon this crust disappeared forever into the gooey pits and cattle were lost in that manner on a number of occasions."[6] In 1955, the Thomases tried burning the waste, which created a "sensational fire that burned throughout the day and into the night."[7] The resulting clouds and columns of black smoke attracted more than 600 curious viewers from far and near.[8]
 
 
 7
 After mesne conveyances, Western Properties, the development arm of a failed savings and loan, acquired Thomas Ranch and became involved in remediation discussions with state and local authorities. In 1986, the California Department of Health Services declared the migration of hazardous substances from the pits an actual or threatened release, constituting a nuisance, and ordered Western Properties to conduct an environmental response. Western Properties eventually did so, at a cost of about $5 million.
 
 
 8
 In July 1994, Western Properties filed the complaint in this case seeking "recovery of response costs and contribution, under § 107 and § 113 respectively," as well as declaratory relief under § 113(g)(2), of CERCLA.[9] The complaint also sought relief under California Health & Safety Code § 25363(e), which parallels CERCLA. The complaint named several oil companies, appellants and others. Claims against some of the defendants were dismissed. The oil companies counterclaimed against Western Properties under § 107(a) and § 113(f)(1) for "contribution and/or indemnity."
 
 
 9
 In 1998, both sides moved for summary judgment. The court denied both motions and ruled that the defendants' equitable defenses could not be asserted "under § 107 because the allowance of equitable defenses is contrary to Congress' intent to impose strict liability."[10] In September 1998, the district court conducted a four-day liability trial, which focused on whose sludge had been dumped. The district court acknowledged the weakness of the evidence but found by a preponderance of the evidence that, more likely than not, the remaining defendants had arranged for their sludge to be dumped in the Wardlows' gravel pits and were therefore liable for the cleanup expenses. After a subsequent eight-day damages-and-allocation trial in May 2000, the district court found that Western Properties had incurred $5,002,903 in costs. It imposed 100% of these costs on the oil companies, jointly and severally, and none on Western Properties, on the theory that Western Properties was a non-polluting innocent landowner. The oil companies appeal.
 
 ANALYSIS
 
 10
 I. Jurisdiction.
 
 
 11
 The oil companies argue that the district court lacked jurisdiction to award damages for remediation against them, because there was no prior civil action against Western Properties pursuant to CERCLA §§ 106 or 107(a).[11] They cite the Fifth Circuit's decision in Aviall Services, Inc. v. Cooper Industries, Inc.[12] In Aviall, the plaintiff amended its complaint, dropping the § 107(a) cost-recovery claim and adding a § 113(f)(1) contribution claim. A three-judge panel held that "a party can seek a § 113(f)(1) contribution claim only if there is a prior or pending federal § 106 or § 107(a) action against it."[13] Aviall was reheard en banc, and the Fifth Circuit repudiated the original panel's holding.[14] The en banc court held that "a PRP [potentially responsible party] may sue at any time for contribution under federal law to recover costs it has incurred in remediating a CERCLA site,"[15] not just "during or following" § 106 or § 107(a) litigation.[16] The en banc majority pointed out that several circuit courts have allowed a party to seek contribution absent a CERCLA action against it, albeit where the issue was not contested.[17] Our circuit has similarly allowed such contribution actions.[18] On January 9, 2004, the Supreme Court granted certiorari.[19]
 
 
 12
 The Fifth Circuit original panel's textual interpretation is plausible, but so is the interpretation of the en banc court. No doubt the Supreme Court decision in Aviall will address the varying views on the subject.[20] Our view is consistent with the en banc decision in the Fifth Circuit but does not rely on it. This case may be distinguishable because the plaintiffs here brought both a § 107(a) action and a § 113(f)(1) action.
 
 
 13
 We begin our analysis of the jurisdictional question with the statutory text. Section 113(f)(1) provides, in relevant part:
 
 
 14
 Any person may seek contribution from any other person who is liable or potentially liable under section 107(a), during or following any civil action under section 106 or under section 107(a).... Nothing in this subsection shall diminish the right of any person to bring an action for contribution in the absence of a civil action under section 106 or section 107.[21]
 
 
 15
 At first glance, these two sentences seem to conflict. They can be understood as consistent, however, both being permissive. The better reading of the second quoted sentence is that a § 106 or a § 107(a) action is not a necessary condition for bringing a § 113(f)(1) action, despite the arguably contrary implication of the phrase "during or following any civil action under section 106 or under section 107" in the first sentence. Thus read, the second sentence prevents us from reading into the first sentence a restrictive "only" before "during or following," and expressly declares that contribution can be sought before a § 106 or a § 107(a) judgment.[22] This second sentence, serving as a savings clause, still allows for contribution actions where a judgment or settlement has determined liability. A restrictive reading, requiring a § 106 or a § 107(a) action to be brought before a contribution action is allowed, would diminish the incentive of a PRP to remove hazardous substances voluntarily and reach a settlement with government agencies as to liability.[23] That contribution may be sought after settlements as well as judgments is a well-established legal tradition.[24] Suppose, for example, that after a car accident, the driver of each car is liable to an injured person. If one driver settles with the victim, he then can sue the other driver for contribution. It does not matter, for settlements or judgments, whether contribution is sought in the original or in a separate action.[25]
 
 
 16
 The Seventh Circuit has made comments in passing that appear to support the argument that a pending action against the party seeking contribution is required. In Rumpke of Indiana, Inc. v. Cummins Engine Co.,[26] a parenthetical sentence observes, as dictum, that "a § 106 or § 107(a) action apparently must either be ongoing or already completed before § 113(f)(1) is available."[27] The court in Rumpke did not deny standing to the current owner of the land, even though no administrative action had been taken, but instead permitted the landowner to sue for its direct response costs under § 107(a). The Seventh Circuit allows this type of suit under its "Akzo exception" — an exception allowing non-polluting PRP landowners, who are not statutory innocent owners under § 101(35),[28] to bring § 107(a) actions and impose joint and several liability on the defendants.[29]
 
 
 17
 In the 1997 case of Pinal Creek Group v. Newmont Mining Corp.,[30] we held that, "[t]ogether, §§ 107 and 113 provide and regulate a PRP's right to claim contribution from other PRPs."[31] "[W]hile § 107 created the right of contribution, the `machinery' of § 113 governs and regulates such actions, providing the details and explicit recognition that were missing from the text of § 107."[32] Pinal Creek held that the enactment of § 113 in 1986[33] did not replace the implicit right to contribution many courts had recognized in § 107(a); rather, § 113 determines the "contours" of § 107, so that a claim for contribution requires the "joint operation" of both sections.[34] In this case, unlike in Aviall, Western Properties originally asserted both a § 107(a) response-cost recovery and a § 113(f)(1) contribution claim and maintained those claims when it amended its complaint. Additionally, the oil companies counterclaimed against Western Properties under both sections. Thus, consistent with § 113(f)(1) and the law of our circuit, the contribution action in this case was pursued "during ... [a] civil action under ... 107(a)."[35] The district court had jurisdiction of the action.
 
 
 18
 II. Findings of Fact.
 
 
 19
 The oil companies argue that the evidence is insufficient to establish that any of them arranged for waste disposal in the Wardlows' gravel pits, or that Eli McColl or the Refiners' Committee on Waste Disposal did so for them as their agent. The district court's findings of fact can be reversed only if clearly erroneous, and not merely because we might have found otherwise on the same evidence.[36]
 
 
 20
 As the district court recognized, no one piece of evidence conclusively establishes liability on the part of the oil companies. We have made an extensive study of the record to determine whether the district court's findings of fact are clearly erroneous. Many of the facts and inferences are stated quite tentatively in the findings. Each defendant operated refineries during World War II in the area of Wilmington, California, and each used sulfuric acid in the refining process of producing high-octane aviation gasoline. Each was more likely than not a member of the Refiners' Committee on Waste Disposal in 1941-1942, although no records are available to establish that fact. The inference is based on records establishing that, from 1930 through 1938, and again from 1945 through 1961, Shell and Atlantic Richfield were members of the committee every year, and Texaco and Union were members every year but one. No records are available for the years 1939 through 1944. This inference is plainly reasonable in the absence of any evidence cutting against it.
 
 
 21
 As for what the Refiners' Committee did, that is harder to say. Did it arrange for waste disposal, or just deal with political and public-relations problems arising out of waste disposal? The district court inferred that it arranged for disposal partly because of a remark made by Director Smith at a meeting of the Directors of the Orange County Water District held on December 10, 1941. The minutes reflect that "[t]he committee is trying to find a suitable location elsewhere" for the "Acid Sludge" that had been dumped "on the Wardlow property gravel pit at the East end of the Santa Ana Canyon in Riverside County." We have carefully examined these minutes. Contrary to the finding of the district court, the reference in the minutes to "the committee" is not a reference to the Refiners' Committee on Waste Disposal.
 
 
 22
 The minutes record that "Director Smith reported for the water conservation committee" regarding a diversion from the San Jacinto River for irrigation and domestic use. The paragraph continues,
 
 
 23
 He further reported that the dump for Acid Sludge (a petroleum product) is established on the Wardlow property gravel pit.... Engineer Bailey has made several tests as to underground percolation through the gravel beds [and has] found rapid percolation of injurious acids which may eventually find its way into our water supply. The committee is trying to find a suitable location elsewhere and is cooperating with the Truck Co. who have [sic] the contract of hauling the Sludge and the Oil Companies who are having the Sludge hauled.
 
 
 24
 It is plain from the context of the minutes that Director Smith was speaking for the "water conservation committee," and that the reference to "[t]he committee" was to that water conservation committee, not to the Refiners' Committee. Notably, when he spoke of those responsible for where the sludge went, he referred not to any committee, but to the "Truck Co." hauling it and "the Oil Companies [not the Refiners' Committee] who are having the Sludge hauled." The finding of fact that this reference was to the Refiners' Committee is clearly erroneous.
 
 
 25
 Despite our conclusion that the district court's finding of fact regarding Director Smith's report is clearly erroneous, we conclude that, on the whole, the district court's findings of fact that the oil companies arranged for waste disposal through the Refiners' Committee is not clearly erroneous. The evidence establishes that Eli McColl, purporting to act on behalf of the Refiners' Committee for which he was a paid employee, spoke on its behalf to officials, applied for a permit to dispose of acid sludge in another location at about the same time, and gave Riverside County assurances that disposal would cease at the Wardlows' property. In his testimony seeking a permit to dispose of waste at another location, McColl said that he represented seven oil companies in the Wilmington area. During that same testimony he explained various disposal alternatives, including a reference to the disposal at the Wardlows' land. He conferred with the Riverside County Attorney, on behalf of the Refiners' Committee, about the problems at the Wardlows' gravel pit disposal site, assuring him that in the future no disposal would be made without the approval of two government agencies. Fifteen years later, the oil companies, including all the defendants in this case, loaned McColl money on account of what they described as a "moral responsibility" to remedy problems at some other disposal sites. The sludge at another disposal site that McColl used for the defendant companies had a chemical composition similar to the composition of the sludge on the Wardlows' land, which was distinctive because of the alkylation process used to make aviation gasoline. The defendant companies produced evidence that they had disposed of their sludge otherwise, but could not establish that they disposed of all of it by other means or in other places.
 
 
 26
 The oil companies cite a Third Circuit case, AL Tech Specialty Steel Corp. v. Allegheny International Credit Corp.,[37] in support of their contention that the district court impermissibly piled conjecture on conjecture to create a mere likelihood that they dumped sludge in the gravel pits. In AL Tech, a lower court found that Allegheny Ludlum had not dumped PCBs in a pond. The appellate court affirmed that finding, stating:
 
 
 27
 It may well be that Allegheny Ludlum used PCB-containing materials during the relevant period, and it may be that the only reasonable explanation for the presence of PCBs in the pond sediments, based on the evidence adduced, is that Allegheny Ludlum dumped them there. But that is different from proving, by a preponderance of the evidence, that Allegheny International is responsible for at least some of the contamination. This AL Tech failed to do.[38]
 
 
 28
 It may well be that one or more of the defendants did not arrange for any of its acid sludge to be deposited at the Wardlow site. They so argue based on a cross-examination admission by Western Properties' expert witness. But "beyond possibility" is not the standard of proof; all that is required is a preponderance of the evidence. The issue is close and intensely factual, and it is entirely possible that, had the district court gone the other way, we would also affirm under the liberal clearly-erroneous standard of review. What is important about AL Tech is not that the defendants prevailed despite the absence of a good explanation of how the waste got there, but rather that the appellate court, under the clearly-erroneous standard of review, affirmed facts found after trial.[39]
 
 
 29
 We affirm the finding that each of the defendant oil companies arranged for the disposal of sludge on the Wardlow land in the four gravel pits. A reasonable jurist might have gone either way as to the preponderance of evidence, particularly for one or two of the defendants. But cases are tried in the trial court, and we cannot say that the trial court's factual determinations were clearly erroneous. A reasonable factfinder could conclude on the evidence presented that each of the four defendants "arranged for disposal" of its acid sludge in the Wardlows' gravel pits through the use of the Refiners' Committee and its employee Eli McColl.
 
 
 30
 III. Full Recovery.
 
 
 31
 The oil companies argue that the district court erred in granting recovery against them jointly and severally for 100% of the cleanup expense, because Western Properties, as owner, was also a PRP and must be required to share the loss. Under our decision in Pinal Creek Group v. Newmont Mining Corp.,[40] they argue, the most Western Properties can get is contribution. The current landowner argues that, because it did not have anything to do with dumping the sludge, it is therefore an innocent landowner entitled to full recovery of its cleanup expenses under the rationale of the Seventh Circuit's Akzo exception cases.[41]
 
 
 32
 On this issue, the oil companies have the better argument. CERCLA provides that persons who are liable or potentially liable under § 107(a) may seek contribution from each other using the mechanics set forth in § 113(f). Western Properties, as the owner of Thomas Ranch, is "potentially liable under § 107(a)" and is therefore a PRP from whom the oil companies may seek contribution.[42] Western Properties knew about the acid sludge when it bought Thomas Ranch.[43] A landowner that buys property with the knowledge that the property is contaminated with hazardous waste cannot establish any of the § 107(b) defenses to § 107(a) liability.[44] That knowledge prevents the landowner from being an innocent owner, which is statutorily restricted to those who "did not know and had no reason to know."[45] Even if Western Properties had not known of the acid sludge pits, the statutory requirement that it "demonstrate to a court that ... [it] carried out all appropriate inquiries" would prevent it from claiming it had no reason to know of the cow-eating pits.[46]
 
 
 33
 Our analysis is controlled by Pinal Creek.[47] In Pinal Creek, a group of companies that admitted responsibility for a portion of environmental cleanup costs sought recovery of all costs from other PRPs under § 107(a). We held that "only a claim for contribution lies between PRPs" and that the liability of each "will correspond to that party's equitable share of the total liability and will not be joint and several."[48] Although § 107(a) creates a right of contribution, and Western Properties can "hold other PRPs liable for a portion" of the cleanup costs, "[t]he contours and mechanics of this right are now governed by § 113."[49] Therefore, even though Western Properties has brought both a § 107(a) and a § 113(f)(1) claim, because it is a PRP, its claim is essentially one for contribution. A non-innocent landowner cannot recover its costs jointly and severally from the polluters, nor can it recover them through indemnity, as distinct from contribution.
 
 
 34
 This case requires us to resolve an additional question that Pinal Creek did not decide. While noting that its holding "that a CERCLA claim by a PRP against another PRP is necessarily for contribution" was consistent with the decisions of the Supreme Court and our sister circuits, Pinal Creek acknowledged the Seventh Circuit's Akzo exception, which "excepts PRPs who have not polluted the site in any way."[50] Because the plaintiff in the case was partly responsible for the contamination, Pinal Creek did not reach the issue of whether such an exception ought to be made. In this case, Western Properties did not contribute at all to the contamination, and it argues that we ought to adopt the Seventh Circuit's Akzo exception. In Rumpke of Indiana, Inc. v. Cummins Engine Co., the purchaser of a dump, who allegedly did not know of hazardous materials that had been deposited there before it purchased, sued firms that had disposed of hazardous wastes there, despite the provision of § 113(f)(2) that shields from contribution PRPs that have settled with the government and reduced the potential liability of other PRPs pro tanto.[51] Rumpke held that an innocent landowner may, instead of suing for contribution under § 113(f)(1), sue for complete cost recovery under § 107(a), so the screen against contribution in § 113(f)(2) for PRPs that had settled with the government would not bar recovery.[52]
 
 
 35
 We are unable to accept the proposition that a non-polluting PRP landowner may sue under § 107(a) for full recovery, jointly and severally, without regard to the limitations of § 113.[53] We cannot reconcile the proposition with our binding precedent in Pinal Creek that PRPs may sue only for contribution, subject to the statutory exception for innocent parties in § 101(35).[54] Innocent landowners are only those deemed innocent under § 101(35). Although Pinal Creek did not reach the question of whether we would adopt the Seventh Circuit's innocent landowner defense, the Pinal Creek ratio decidendi argues against adopting it. Section 113 is a comprehensive scheme for adjustment of the burden among parties that are liable or potentially liable for § 107(a) recoveries, so there is no reason to read a silent implication of an alternative scheme into § 107(a).
 
 
 36
 There is some attraction, in certain circumstances, to a broad innocent-landowner rule for non-polluting landowners who are not statutorily innocent under § 101(35). The attractiveness is equitable, not textual, and the contribution statute already allows for equity to be taken into account.[55] Suppose a person bought a lot on which to build a home, not knowing that some years ago a truck had overturned and spilled hazardous substances into the ground, which had seeped down into the water table. Suppose further that by due diligence he could have found out and is deemed to have had reason to know, so he is not a statutory innocent owner. In such a case, the district court would be able to consider the equities, as between the almost-innocent PRP landowner and the company whose truck had overturned, using its § 113(f)(1) authority to "allocate response costs among liable parties using such equitable factors as the court determines are appropriate."[56]
 
 
 37
 Section 113 is not a contribution scheme in which each joint tortfeasor bears a pro rata share of the loss regardless of its degree of fault.[57] As we held in Boeing Co. v. Cascade Corp., the district court has, under this provision, "discretion to decide what factors ought to be considered, as well as the duty to allocate costs according to those factors", without being bound by or limited to any predetermined list of factors.[58] Because, in an appropriate case, the court might properly exercise its discretion under § 113(f)(1) to allocate a smaller portion or even no portion of the cleanup cost to a non-polluting PRP landowner, there is no reason to read such authority into § 107(a) against the limitations of the words of § 107(b).[59]
 
 
 38
 On the other hand, if non-polluting PRP landowners could recover through § 107(a) in addition to, or notwithstanding, § 113, they could evade the § 113(f)(1) requirement that factors for allocation be "equitable," and potentially could obtain double recoveries. This interpretation would violate our holding in Boeing that "one equitable factor is preventing someone from recovering for the same harm twice."[60] Suppose, hypothetically, that Slagacre would be worth $1 million but for hazardous substances deposited by a polluter that will cost $500,000 to clean up. Suppose further that a prospective purchaser, having obtained an accurate engineer's report to this effect, buys the property for $500,000, and spends $500,000 to clean it up. He now has property worth $1 million for which he paid $1 million, and he has suffered no financial loss from the pollution. The seller (or the seller's predecessor in title), not the knowledgeable purchaser, suffered the loss. If the purchaser nevertheless recovers the entire $500,000 cleanup expense from the polluter, he might obtain a windfall. Recovery from the polluter might nevertheless be appropriate, to compensate the purchaser and provide him with an incentive for taking the risk and making the effort necessary to get the land cleaned up and marketable, but equity might require that the recovery be reduced. If the polluter had previously paid the purchaser's predecessor in title fairly-arrived-at compensation (which might be the estimated cleanup cost) for having polluted Slagacre, then the polluter would have paid for the same harm twice.
 
 
 39
 The case before us is closer to the Slagacre hypothetical than to the innocent-homeowner hypothetical, illustrating why the Seventh Circuit's Akzo exception for non-polluting landowners is inconsistent with the § 113(f)(1) "equitable factors" that our circuit requires in suits between PRPs. The Wardlows sold the right to deposit the hazardous substances on their land for $2,000 in 1941, which was then a significant sum.[61] They were making money by operating part of their property as a dump for noxious wastes. The hazard was open and notorious from the beginning. Acid sludge pits that eat unfortunate cows and that stink so badly that they can be smelled from a mile away are no secret. Western Properties knew of the pits because it diligently investigated Thomas Ranch before purchasing it, obtained from its own experts an estimated cleanup cost, and in all likelihood agreed upon a purchase price taking into account that amount. It might provide inequitable double recovery for Western Properties to be fully compensated by the oil companies for the pollution cleanup expense it knew of when it agreed upon the purchase price. Generally, when a buyer knows of a cleanup liability prior to purchase, proper allocation under the equitable factors of § 113(f)(1) requires that the PRP buyer not be relieved of the entire expense of cleanup. This is not a question of whether the buyer expressly obtained a discount because of the environmental liability. No sensible person would pay as much for a property with a known liability as for one without, whether the price expressly discounted for the cleanup or not. A rule that said "a purchaser who has obtained a discount on account of a known liability cannot obtain full recompense for cleanup expenses from a polluter" would merely generate land purchase documentation by sophisticated purchasers and sellers with the empty statement that "the price is not discounted to reflect the anticipated cleanup expense for known or unknown hazardous materials that may be on the land." This type of ineffective rule would not help judges discern whether purchasers would have paid more or sellers would have demanded more without the anticipated cleanup expense.
 
 
 40
 We reject a non-polluting PRP landowner exception beyond the one provided by § 101(35). Western Properties, as a PRP, is limited to bringing a contribution action governed by § 113. Because the district court's judgment did not use equitable factors as required by § 113(f)(1) in determining the respective liability of each PRP, including Western Properties, and because it imposed joint as well as several liability for the amount due, we vacate that portion of its decision and remand for further proceedings consistent with this opinion and with § 113. Each oil company is liable for its equitable share of the expense.
 
 
 41
 IV. Delay and Laches.
 
 
 42
 There was a lot of delay. The acid sludge was dumped more than half a century before this suit was filed. Informative primary sources — people as well as business records — were scarce on all sides. Most of that delay results from CERCLA, not from the parties. There will always be a problem with fairness and truth when the law makes people liable for something that was done so long ago.[62] The uncertainty is an inevitable consequence of running the statute of limitations from discovery rather than from conduct, with no statute of repose.
 
 
 43
 On a theory of laches,[63] the oil companies argue that the district court erred by not reducing their shares of response costs because of Western Properties' delay in filing suit. Typically, the equitable defense of laches bars an action and precludes relief. CERCLA does not appear to admit of equitable defenses. Section 107(a) expressly limits available defenses to the three listed in § 107(b),[64] although other sections also may operate as a defense to liability.[65] Several of our sister circuits have held that § 107(a) bars equitable defenses that are not enumerated in the statutory text of CERCLA.[66] We follow their lead and hold that equitable defenses such as laches are not available as a bar to § 107(a) liability. Nevertheless, the same adherence to statutory text that mandates our rejection of equitable defenses in § 107(a) and § 113(f)(1) actions requires us to give the district court wide latitude in "using such equitable factors as [it] determines are appropriate" when allocating response costs among the liable parties in a § 113(f)(1) contribution action.[67] Therefore, even though the oil companies' laches argument fails as a matter of law, delay may be relevant to the extent that the district court considers it to be an appropriate equitable factor.[68] The district court did not consider the equities when it found the oil companies liable for necessary response costs, future costs, and prejudgment interest. On remand, the district court may, if it determines it appropriate, consider whether any delay by Western Properties (or its predecessors in title) in bringing suit was unreasonable and, if so, whether the delay prejudiced the oil companies' ability to defend themselves and, if so, to what extent.
 
 
 44
 V. Amount.
 
 
 45
 The oil companies argue that Western Properties spent an unreasonable amount on the cleanup and should be limited to some lower amount as the reasonable costs of remediation. The district court found that Western Properties incurred $5,002,903 in "necessary costs of response" and that, under § 107(a), it was also entitled to recover 100% of future necessary response costs as well as pre-judgment interest.[69] We reject the challenge to the overall amount. However, the district court was operating under the assumption that Western Properties was an innocent, non-polluting plaintiff properly bringing a § 107(a) action for full indemnity. Because Western Properties is limited to contribution for an equitable share, as calculated under § 113(f)(1), we vacate and remand for further proceedings concerning equitable shares of the $5,002,903.
 
 
 46
 We note that § 113(f)(1) allows the district court to allocate equitably "response costs" as it sees fit. Unlike the restrictions applicable to full-indemnity actions under § 107(a), the response costs of § 113(f)(1) are not limited to "necessary" costs "consistent with the national contingency plan."[70] CERCLA "response costs" are synonymous with "removal costs," and they include a wide range of cleanup actions "as may be necessary taken in the event of the threat of release of hazardous substances into the environment," such as monitoring and evaluating the threat of release, preventing or mitigating damage to public health, and constructing security fencing.[71] We see no reason why the $5 million in necessary response costs that Western Properties would have recovered under § 107(a) should not be the response costs recognized under § 113(f)(1). Nevertheless, as our discussion in the previous section indicates, the district court may take into account equitable factors, possibly including Western Properties' delay in bringing suit, when it allocates these response costs among the PRPs. What is recoverable as a necessary response cost may not be necessarily equitable to distribute in its entirety among the PRPs.
 
 CONCLUSION
 
 47
 We reject the challenges to jurisdiction and to the district court's findings of fact and AFFIRM the district court on these matters. We VACATE and REMAND for equitable allocation of Western Properties' response costs among the liable parties, consistent with this opinion. Each party shall bear its own costs on appeal.
 
 
 
 Notes:
 
 
 *
 The Honorable Susan R. Bolton, United States District Judge for the District of Arizona, sitting by designation
 
 
 [1]
 The Comprehensive Environmental Response, Compensation, and Liability Act of 1980, or "CERCLA," is codified generally at 42 U.S.C. §§ 9601-9675
 
 
 [2]
 Declaration of John E. Van Vlear in Opposition to Defendant Oil Companies' Motion for Summary Judgment ¶ 17 (Oct. 29, 1997)
 
 
 [3]
 Letter from Elma Wardlow to Roy H. Mann (Sept. 12, 1983)
 
 
 [4]
 Acid Sludge Dump in County Opposed, Riverside Daily Press, Jan. 26, 1942, at 4.
 
 
 [5]
 Memorandum from Earl Redwine, Riverside County Counsel, to the Riverside County Board of Supervisors (Feb. 14, 1942)
 
 
 [6]
 Tar Pit Hazard Goes Up in Smoke, Riverside Enterprise, Apr. 5, 1955.
 
 
 [7]
 Id.
 
 
 [8]
 Heavy Smoke This Morning Due to Oil Sump Burning, Corona Independent, Apr. 4, 1955.
 
 
 [9]
 42 U.S.C. §§ 9607(a), 9613(f)(1), (g)(2)
 
 
 [10]
 W. Props. Servs. Corp. v. Shell Oil Co., No. CV 4695 RAP (C.D.Cal. Jan. 29, 1998).
 
 
 [11]
 42 U.S.C. §§ 9606, 9607(a)
 
 
 [12]
 Aviall Servs., Inc. v. Cooper Indus., Inc., 263 F.3d 134 (5th Cir.2001).
 
 
 [13]
 Id. at 137.
 
 
 [14]
 Aviall Servs., Inc. v. Cooper Indus., Inc., 312 F.3d 677 (5th Cir.2002) (en banc), cert. granted, ___ U.S. ___, 124 S.Ct. 981, 157 L.Ed.2d 811 (Jan. 9, 2004).
 
 
 [15]
 Id. at 681.
 
 
 [16]
 42 U.S.C. § 9613(f)(1)
 
 
 [17]
 Aviall, 312 F.3d at 688 n. 21 (citing, inter alia, Crofton Ventures Ltd. P'ship v. G&H P'ship, 258 F.3d 292 (4th Cir.2001); Kalamazoo River Study Group v. Rockwell Int'l Corp., 274 F.3d 1043 (6th Cir.2001); Bedford Affiliates v. Sills, 156 F.3d 416 (2d Cir.1998); PMC, Inc. v. Sherwin-Williams Co., 151 F.3d 610 (7th Cir.1998); Control Data Corp. v. S.C.S.C. Corp., 53 F.3d 930 (8th Cir.1995); Amoco Oil Co. v. Borden, Inc., 889 F.2d 664 (5th Cir.1989)).
 
 
 [18]
 E.g., Cadillac Fairview/Cal., Inc. v. Dow Chem. Co., 299 F.3d 1019, 1024 (9th Cir.2002); Carson Harbor Vill., Ltd. v. Unocal Corp., 270 F.3d 863, 872 (9th Cir.2001) (en banc); Jones-Hamilton Co. v. Beazer Materials & Servs., Inc., 973 F.2d 688, 691 (9th Cir.1992).
 
 
 [19]
 Aviall Servs., Inc. v. Cooper Indus., Inc., 312 F.3d 677 (5th Cir.2002) (en banc), cert. granted, ___ U.S. ___, 124 S.Ct. 981, 157 L.Ed.2d 811 (Jan. 9, 2004).
 
 
 [20]
 See, e.g., In re Reading Co., 115 F.3d 1111, 1119 (3d Cir.1997); E.I. Dupont De Nemours & Co. v. United States, 297 F.Supp.2d 740 No. 97-497, 2003 WL 23104700 (D.N.J. Dec. 30, 2003).
 
 
 [21]
 42 U.S.C. § 9613(f)(1)
 
 
 [22]
 See Aviall, 312 F.3d at 681, 686-87.
 
 
 [23]
 See 42 U.S.C. §§ 9613(f)(2)-(3), 9622.
 
 
 [24]
 See, e.g., Restatement (Third) of Torts § 23(a).
 
 
 [25]
 See Uniform Apportionment of Tort Responsibility Act § 7(d); Restatement (Third) of Torts § 23 cmt. b ("[A] person seeking contribution may assert a claim for contribution and obtain a contingent judgment in an action in which the person seeking contribution is sued by the plaintiff, even though the liability of the person against whom contribution is sought has not yet been extinguished.").
 
 
 [26]
 Rumpke of Ind., Inc. v. Cummins Engine Co., 107 F.3d 1235 (7th Cir.1997).
 
 
 [27]
 Id. at 1241.
 
 
 [28]
 42 U.S.C. § 9601(35)
 
 
 [29]
 Id.; AM Int'l, Inc. v. Datacard Corp., 106 F.3d 1342, 1347 (7th Cir.1997); Akzo Coatings, Inc. v. Aigner Corp., 30 F.3d 761, 764 (7th Cir.1994); see Union Station Assocs. v. Puget Sound Energy, Inc., 238 F.Supp.2d 1218, 1222 (W.D.Wash.2002) ("Only the Seventh Circuit appears to have officially adopted such an exception.... It is undisputed that this is an unresolved legal issue in the Ninth Circuit.").
 
 
 [30]
 Pinal Creek Group v. Newmont Mining Corp., 118 F.3d 1298, 1306 (9th Cir.1997) (holding that "a PRP cannot assert a claim against other PRPs for joint and several liability").
 
 
 [31]
 Id. at 1301.
 
 
 [32]
 Id. at 1302.
 
 
 [33]
 Superfund Amendments and Reauthorization Act of 1986, Pub.L. No. 99-499, § 113, 100 Stat. 1613, 1647-52 (1986)
 
 
 [34]
 Pinal Creek, 118 F.3d at 1301-02, 1306.
 
 
 [35]
 42 U.S.C. § 9613(f)(1)
 
 
 [36]
 Freeman v. Allstate Life Ins. Co., 253 F.3d 533, 536 (9th Cir.2001).
 
 
 [37]
 AL Tech Specialty Steel Corp. v. Allegheny Int'l Credit Corp., 104 F.3d 601 (3d Cir.1997).
 
 
 [38]
 Id. at 609.
 
 
 [39]
 Id.
 
 
 [40]
 Pinal Creek Group v. Newmont Mining Corp., 118 F.3d 1298 (9th Cir.1997).
 
 
 [41]
 See, e.g., Rumpke of Ind., Inc. v. Cummins Engine Co., 107 F.3d 1235 (7th Cir.1997); AM Int'l, Inc. v. Datacard Corp., 106 F.3d 1342 (7th Cir.1997).
 
 
 [42]
 42 U.S.C. § 9613(f)(1);see New York v. Shore Realty Corp., 759 F.2d 1032, 1043-45 (2d Cir.1985) (current owner liable under plain meaning of § 107(a)(1) without a showing that it owned the property at the time of the release or that it contributed to the polluted conditions at the site); 42 U.S.C. § 9601(20)(A), (35)(A)-(B).
 
 
 [43]
 In its brief, Western Properties states: "When it purchased the property in 1985, WPSC [Western Properties] was aware that the acid pits existed on a portion of the property." Appellee's Br. at 6
 
 
 [44]
 42 U.S.C. § 9607(b) provides:
 Defenses. There shall be no liability under subsection (a) of this section for a person otherwise liable who can establish by a preponderance of the evidence that the release or threat of release of a hazardous substance and the damages resulting therefrom were caused solely by —
 (1) an act of God;
 (2) an act of war;
 (3) an act or omission of a third party other than an employee or agent of the defendant, or than one whose act or omission occurs in connection with a contractual relationship existing directly or indirectly, with the defendant....
 
 
 [45]
 Id. § 9601(35)(A) (defining "contractual relationship" to include non-government owners who bought the property after disposal of a hazardous substance, unless they can establish "by a preponderance of the evidence:
 (i) At the time [they] acquired the facility[they] did not know and had no reason to know that any hazardous substance which is the subject of the release or threatened release was disposed of on, in, or at the facility").
 
 
 [46]
 Id. § 9601(35)(B)(i). In determining whether "all appropriate inquiries" have been carried out with respect to property bought before May 31, 1997,
 a court shall take into account —
 (aa) any specialized knowledge or experience on the part of the defendant;
 (bb) the relationship of the purchase price to the value of the property, if the property was not contaminated;
 (cc) commonly known or reasonably ascertainable information about the property;
 (dd) the obviousness of the presence or likely presence of contamination at the property; and
 (ee) the ability of the defendant to detect the contamination by appropriate inspection.
 Id. § 9601(35)(B)(iv).
 
 
 [47]
 Pinal Creek Group v. Newmont Mining Corp., 118 F.3d 1298 (9th Cir.1997).
 
 
 [48]
 Id. at 1301.
 
 
 [49]
 Id. at 1301, 1302.
 
 
 [50]
 Id. at 1303 & n. 5 (citing Rumpke, 107 F.3d at 1241).
 
 
 [51]
 Rumpke of Ind., Inc. v. Cummins Engine Co., 107 F.3d 1235 (7th Cir.1997). The Rumpke court did not analyze whether the purchaser should be imputed to have had constructive knowledge under § 101(35)(A)-(B).
 
 
 [52]
 Rumpke, 107 F.3d at 1241-42.
 
 
 [53]
 We note thatPinal Creek restricted its definition of a PRP, expressly excluding "those `person[s] otherwise liable' under § 107(a) who can establish they are not liable by virtue of the defenses set forth in § 107(b)." Pinal Creek, 118 F.3d at 1300 n. 1 (quoting 42 U.S.C. § 9607(b)). Under the Pinal Creek definition, which we adopt in this case, a statutory innocent owner is not a PRP. This definition comports with our decisions in Cadillac Fairview/Cal., Inc. v. Dow Chem. Co., 840 F.2d 691 (9th Cir.1988), and Carson Harbor Vill., Ltd. v. Unocal Corp., 270 F.3d 863 (9th Cir. 2001) (en banc), in which non-polluting landowners proceeded under § 107(a) claims without objection from our court, because the court implicitly assumed the plaintiffs were statutory innocent owners, even though the decisions did not engage in analysis under § 101(35) to determine whether they "had no reason to know" of the hazardous substances they subsequently discovered on their properties.
 
 
 [54]
 42 U.S.C. § 9601(35)
 
 
 [55]
 Cf. Carson Harbor Vill., Ltd. v. Unocal Corp., 270 F.3d 863, 883 (9th Cir.2001) (en banc) ("[N]either a logician nor a grammarian will find comfort in the world of CERCLA.").
 
 
 [56]
 42 U.S.C. § 9613(f)(1)
 
 
 [57]
 See In re Reading Co., 115 F.3d 1111, 1117 (3d Cir.1997) (concluding that § 113(f) preempts state common law contribution claims).
 
 
 [58]
 Boeing Co. v. Cascade Corp., 207 F.3d 1177, 1187 (9th Cir.2000).
 
 
 [59]
 See Pinal Creek, 118 F.3d at 1301 n. 3 (noting that it did "not foreclose the possibility that a court could find, after balancing the equities as required by § 113, that a particular PRP's equitable share of the total liability should be zero").
 
 
 [60]
 Boeing, 207 F.3d at 1189 (noting the prohibition in 42 U.S.C. § 9614(b) against double recovery).
 
 
 [61]
 Corrected to the current value of the dollar, $2,000 in 1941 is equivalent to roughly $25,000 in 2003See http://eh.net/hmit/ppowerusd/; http://www.minneapolisfed.org/Research/data/us/calc/.
 
 
 [62]
 Cf. Cadillac Fairview/Cal., Inc. v. Dow Chem. Co., 299 F.3d 1019, 1029-30 (9th Cir.2002) (rejecting the government's argument that theoretically, under CERCLA, the government could hold liable American soldiers who liberated two islands in Alaska from Japanese possession during World War II for having deposited lead bullets into the ground).
 
 
 [63]
 See Danjaq LLC v. Sony Corp., 263 F.3d 942, 950-59 (9th Cir.2001) (delineating the requirements of a laches defense: delay that is unreasonable and prejudicial).
 
 
 [64]
 42 U.S.C. § 9607(a) (providing that § 107(a) liability is "subject only to the defenses set forth in subsection (b)," which are acts of God, acts of war, and acts or omissions of third parties other than by employees, agents, or parties to a contractual relationship)
 
 
 [65]
 E.g., id. § 9607(i) (registered pesticides); id. § 9613(f)(2) (settlement with government); id. § 9613(g) (statute of limitations).
 
 
 [66]
 Blasland, Bouck & Lee, Inc. v. City of N. Miami, 283 F.3d 1286, 1303-04 (11th Cir.2002) (equitable pay-when-paid clause); Town of Munster v. Sherwin-Williams Co., 27 F.3d 1268, 1271-73 (7th Cir.1994) (laches); Velsicol Chem. Corp. v. Enenco, Inc., 9 F.3d 524, 530 (6th Cir.1993) (laches); Gen. Elec. Co. v. Litton Indus. Automation Sys., Inc., 920 F.2d 1415, 1418 (8th Cir.1990); abrogated on other grounds by Key Tronic Corp. v. United States, 511 U.S. 809, 814, 114 S.Ct. 1960, 128 L.Ed.2d 797 (1994) (unclean hands); Smith Land & Improvement Corp. v. Celotex Corp., 851 F.2d 86, 89-91 (3d Cir.1988) (caveat emptor).
 
 
 [67]
 42 U.S.C. § 9613(f)(1)
 
 
 [68]
 See Town of Munster v. Sherwin-Williams Co., 27 F.3d 1268, 1273 (7th Cir.1994).
 
 
 [69]
 42 U.S.C. § 9607(a)(4)(B)
 
 
 [70]
 Id.
 
 
 [71]
 Id. § 9601(23), (25).